UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
TOWN OF NEW WINDSOR,

                                    Plaintiff,          **OPINION AND ORDER**

             - against -                                        10-CV-8611 (CS)

AVERY DENNISON CORPORATION,
DENNISON MONARCH SYSTEMS, INC., and
DENNISON MANUFACTURING COMPANY,

                                    Defendants.
-------------------------------------------------------------------x

Appearances:
Kimberlea Shaw Rea, Esq.
Paul A. Clewell, Esq.
Westervelt & Rea
Nyack, New York
*Counsel for Plaintiff*

Matthew C. Moench
Deborah L. Shuff
David Brooman
Drinker Biddle & Reath LLP
Philadelphia, Pennsylvania
*Counsel for Defendants*

Seibel, J.

        Before the Court is Defendants' Motion to Dismiss Plaintiff's Amended Complaint.

(Doc. 22.)  For the reasons stated below, Defendants' Motion is GRANTED IN PART and

DENIED IN PART.

I.      **Background**

        I assume the facts, although not the conclusions, in the Amended Complaint ("Am.

Compl."), (Doc. 18), to be true for purposes of Defendants' Motion.  For reasons I will discuss

later, I also consider various documents attached to the parties' submissions.  Where a fact is not from the Amended Complaint, I will so indicate.

Plaintiff, the Town of New Windsor (the "Town"), is a municipal corporation organized under the laws of the State of New York.  (Am. Compl. ¶ 6.)  Defendant Dennison Monarch Systems, Inc. ("Dennison Monarch") was a corporation organized under the laws of the State of Delaware, authorized to do business in New York since 1981.  (*Id*. ¶ 7; Rea Decl. Ex. A.)[1] Dennison Monarch filed a Certificate of Dissolution with Delaware on March 15, 2001, (Moench Decl. Ex. D),[2] and notified the state of New Jersey of its dissolution on August 15, 2001, (Rea Decl. Ex. C), but apparently never notified the state of New York, because as of March 2, 2011, it was listed as an active corporation in the New York State Department of State's ("NYSDOS") Division of Corporations' online Business Entity Database ("NY Database"), (*id.* Ex. A). Dennison Monarch is a wholly owned subsidiary of Defendant Dennison Manufacturing Co. ("Dennison Manufacturing"), a corporation organized under the laws of the State of Nevada, authorized to do business in the State of New York since 1962.  (Am. Compl. ¶ 7.)  Dennison Manufacturing is a wholly owned subsidiary of Defendant Avery Dennison Corporation ("Avery Dennison"), a corporation organized under the laws of the State of Delaware, authorized to do business in New York since 1977.  (*Id*.)

## A.    Defendants' Plant

From 1956 to 1994, Defendants operated a manufacturing facility (the "Plant") located at 15-21 Ruscitti Road, also known as MacArthur Avenue, in the Town.  (*Id*. ¶¶ 2, 9.)  The Plant

---

[1]    "Rea Decl." refers to the Declaration of Kimberlea Shaw Rea in Support of Plaintiff's Opposition to Defendants' Motion to Dismiss the Amended Complaint.  (Doc. 27.)

[2]    "Moench Decl." refers to the Declaration of Matthew C. Moench in Support of Defendants' Motion to Dismiss the Amended Complaint.  (Doc. 24.)

manufactured metal office furniture, accessories, office equipment, and computer equipment. (*Id.* ¶¶ 2, 13.)  Avery Dennison owns the Plant property, which consists of 5.8 acres.  (*Id.* ¶¶ 10–11.)  The former physical Plant building, which Avery Dennison demolished in 2009, occupied 2.2 acres in the northwestern portion of the property.  (*Id.* ¶ 11.)

Plant operations included cutting, shaping, welding, deburring, degreasing, coating, and painting metal components.  (*Id.* ¶ 13.)  Part of the Plant's operations utilized chlorinated solvents in two large degreasing pits located in the central portion of the Plant.  (*Id.*)  For years, massive amounts of solvent and process wastes were discharged from these pits and from other sources at the Plant into the soils, groundwater, and bedrock underlying the Plant property.  (*Id.*)

In 1983, inspectors from the United States Environmental Protection Agency ("EPA") issued the Defendants a Notice of Violation after finding that the Plant's coating operation, which included the use of hundreds of tons of solvents, was producing emissions of volatile organic compounds that violated its Clean Air Act permit limits, and otherwise failed to comply with state and federal law.  (*Id.* ¶ 14.)  In 1984, the EPA also classified the Plant as a Significant Industrial User, due to the high volume of industrial process liquids generated by the Plant.  (*Id.*)  In 1985, because Defendants continued Plant operations despite the 1983 Notice of Violation, the United States Department of Justice filed an enforcement action seeking injunctive relief and $25,000 in civil penalties against the Plant.  (*Id.*)[3]  Defendants stopped manufacturing operations in approximately 1994.  (*Id.* ¶ 15.)

### B.    The Town Water Supply

The Town owns property immediately adjacent to the eastern boundary of the Plant property, including wetlands, two Little Falls Ponds (the "Ponds") and the Little Falls Ponds

---

[3]    The Amended Complaint is silent as to the outcome of that enforcement action.

Wellfield (the "Wellfield").  (*Id.* ¶¶ 3, 12.)  Three wells (the "Wells") located in the Wellfield have supplied part of Plaintiff's drinking water since the late 1960s.  (*Id.* ¶¶ 3, 12.)  In 1971 and 1974, the Plaintiff commissioned the repair of Well equipment, significantly increasing the daily yield of the Wells.  (*Id.* ¶ 16.)  After a period of time, Plaintiff purchased Catskill Aqueduct water from New York City at very favorable rates, so that water became a major source of the Town's supply.  (*Id.* ¶ 17.)  As a result, the Wells were decommissioned, but remained an emergency backup water source for Plaintiff.  (*Id.*)

During the 1990s, Avery Dennison and Dennison Manufacturing conducted several environmental investigations of the Plant.  (*Id.* ¶ 22.)  Early investigations revealed massive amounts of solvent contamination in the soils, groundwater, and bedrock under the former Plant site.  (*Id.* ¶ 27.)  The New York State Department of Environmental Conservation ("NYSDEC"), attributes the source of contamination to the decades of use of the two large degreasing pits at the Plant.  (*Id.*)  Some of the contaminants discovered in environmental samples from the Plant include 1,1,1-trichloroethane, trichloroethene, perchloroethene, 1,2-dichloroethane, 1,1,-dichloroethene, and 1,2-dichloroethene.  (*Id.*)  Plaintiff alleges that these chemicals are "hazardous substances," as that term is defined in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601–9675.[4]  According to the EPA, exposure above Maximum Contaminant Levels to 1,1,1-trichloroethane could cause liver, nervous system, or circulatory problems, and similar exposure to 1,2-dichloroethene could cause increased risk of cancer.  (Rea Decl. Ex. L, at 2–3.)  Due to the flow of groundwater from

---

[4]    CERCLA does not actually list any of these chemicals as hazardous.  *See* 42 U.S.C. § 9601(14).  Rather, the statute leaves it to the discretion of the Administrator of the EPA to designate hazardous substances, *see id.* § 9602(a), and refers to other statutes that do the same, *see id.* § 9601(14) (citing, *e.g.*, 33 U.S.C. § 1321).  "[P]etroleum . . . natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas)," however, are excluded from the definition of hazardous substances.  *Id.*

the Plant toward Plaintiff's property, the edge of the plume consisting of these solvents is now contaminating the Wells.  (Am. Compl. ¶ 3.)

### C.     The Voluntary Cleanup Agreement

In 1999, after years of negotiations with NYSDEC, Dennison Monarch signed Voluntary Cleanup Agreement #V00135-3 ("VCA"), (Moench Decl. Ex. I), under NYSDEC's then-existing Voluntary Cleanup Program.  (*Id.* ¶ 22.)  Under the VCA, Dennison Monarch agreed to (1) investigate the extent of contamination on the Plant property and adjacent properties, and (2) clean up contamination on Plant property.  (*Id.* ¶ 23.)  The VCA does not require Defendants to remediate Plaintiff's property or any other off-site contaminated properties.  (*Id.* ¶ 24.)  Although Dennison Monarch Systems signed the VCA, Avery Dennison and Dennison Manufacturing have always conducted the investigations, dealt with the NYSDEC, and planned and conducted the fieldwork required under the VCA.  (*Id.* ¶ 25.)

During the first decade of investigations after signing the VCA, Defendants' remediation consultants proposed to NYSDEC that leaving the solvents in the ground and groundwater was the right remedy, insisting that the solvent plume would clean itself up.  (*Id.* ¶ 29.)  NYSDEC rejected this approach.  (*Id.*)  Defendants' next proposal to NYSDEC involved "in situ" remediation.  (*Id.*)  Rather than remove the solvent-contaminated soil, thus eliminating the source of the plume, Defendants proposed injecting chemicals into the soil to treat the solvent contamination.  (*Id.*)  Defendants would treat only Plant property, and this method would not remediate the solvents present in the soil of Plaintiff's property.  (*Id.*)  Defendants' remediation consultant is now preparing a design work plan for the in situ method.  (*Id.*)  Avery Dennison has refused to remediate the Town property.  (*Id.* ¶ 26.)  In 2005, NYSDEC instructed Defendants to

prepare a remedial contingency plan should the Town begin to draw from the Wells again, but Defendants refused to do so.  (*Id.* ¶ 30.)

### D.     The Town's Current Water Supply

Defendants have always insisted that the Wells are not contaminated with solvents from the Plant.  (*Id.* ¶ 30.)  Defendants have taken soil samples, groundwater monitor well samples, and surface water samples from the Ponds.  (*Id.*)  Defendants, however, have never sampled the Wells' drinking water despite several requests from the Town to do so.  (*Id.*)  Defendants have maintained that the solvent contamination was so minor in the groundwater monitoring wells in the wetlands adjoining the Wellfield that the solvent plume could not possibly extend into the Wells themselves.  (*Id.*)

Eventually, the Town hired its own geological consultant, Conrad Geoscience Corporation ("Conrad"), to analyze Defendants' data and assist in negotiations between the Town and Defendants.  (*Id.* ¶ 31.)  Defendants continued to insist that there was no evidence that the Wells' drinking water was contaminated.  (*Id.*)  In response, Conrad sampled the Wells' drinking water in May 2008 and found that the plume had migrated into the Wells.  Conrad immediately provided this data to Defendants.  (*Id.*)  Notwithstanding this data, Defendants refused to remediate the solvent plume in the wetlands and the Wellfield and have not taken any samples of the Wells' drinking water.  (*Id.* ¶ 32.)

In the past few years, Plaintiff has experienced persistent water shortages that have worsened every year, and it needs to reactivate the Wells.  (*Id.* ¶ 18.)  The Town engineer, however, has cautioned against using the Wells because of the solvent contamination.  (*Id.*)  Specifically, according to the engineer, pumping the wells would alter the flow of groundwater and create a cone of depression that could draw in chlorinated solvents, increasing the already-

existing solvent contamination in the Wells.  (*Id*.)  And because the Plant property remains heavily contaminated today, solvents will continue to flow into the soil of Plaintiff's property, further contaminating the drinking water supply.  (*Id.* ¶ 33.)

Without water from the Wells, and because of recent sharp increases in the price of New York City water, which now costs Plaintiff $30,000 per month in excess charges alone, Plaintiff has been forced to drill more than twelve exploratory wells in various locations in search of additional supply.  (*Id.* ¶ 19–20.)  The Town has obtained approval from the Department of Health for the only successful exploratory wellfield to date, but that supply is not enough.  (*Id.* ¶ 19.)  Even if enough new wells are found to satisfy Plaintiff's need, the Town will incur costs for the design, development, and construction of treatment and delivery systems.  (*Id.*)  To date, Plaintiff has spent more than $250,000 in exploring for new groundwater supplies.  (*Id.*)  On February 27, 2011, New York City officials unexpectedly shut down the Catskill Aqueduct Tap that provides most of Plaintiff's water because of problems related to upstream turbidity.  (*Id.* ¶ 21.)  Plaintiff is in a water emergency and must be able to reactivate the Wells.  (*Id.*)  The Town engineer estimates that Plaintiff will spend $30 million over the next twenty years to compensate for the contaminated Wells.  (*Id.* ¶ 36.)

### E.   Procedural Posture

On October 7, 2010, Plaintiff brought this lawsuit against Defendants in New York state court, alleging negligence, strict liability for ultrahazardous activities, trespass, private nuisance, and public nuisance.  (Doc. 1 Ex. D.)  On November 15, 2010, Defendants removed the case to this Court.  (Doc. 1.)  On February 3, 2011, the New Windsor Town Board ("Board") "ratified and approved" this lawsuit.  (Rea Decl. Ex. N.)  On February 17, 2011, I granted Plaintiff leave to amend the Complaint.  (Feb. 17, 2011 Minute Entry.)  On March 3, 2011, Plaintiff filed the

Amended Complaint, alleging the same five causes of action as in the original Complaint.

Plaintiff seeks $30 million in "compensatory, consequential, and special damages," punitive

damages, and injunctive relief requiring Defendants to remediate solvent contamination on

Plaintiff's property.  (Am. Compl. 20.)  Defendants, in their Motion to Dismiss, argue that (1)

Defendant Dennison Monarch lacks capacity to be sued, (2) NYSDEC has primary jurisdiction

over Plaintiff's claims, (3) Plaintiff lacks capacity to bring this suit, and (4) Plaintiff's strict

liability, trespass, and private nuisance claims fail as a matter of law.  (*See* Ds' Mem.)[5]

## II.   <u>Applicable Legal Standards</u>

### A.   **Motions to Dismiss Standard of Review**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S.

Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "While a

complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires

more than labels and conclusions, and a formulaic recitation of the elements of a cause of action

will not do."  *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks

omitted).  While Federal Rule of Civil Procedure 8 "marks a notable and generous departure

from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of

discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 129 S. Ct. at 1950.

---

[5]     "Ds' Mem." refers to Defendants' Memorandum in Support of Defendants' Motion to Dismiss the
Amended Complaint.  (Doc. 23.)

In considering whether a complaint states a claim upon which relief can be granted, the court may "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determine whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief."  *Id.* Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  *Id.* (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

## B.      Consideration of Documents Outside the Pleadings

When deciding a motion to dismiss, the Court is entitled to consider, among other things, the following:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents "integral" to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in [a] defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011) (internal quotation marks omitted).

"Rule 201 of the Federal Rules of Evidence permits judicial notice of a fact that is 'either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably . . . questioned.'"  *United States v. Bryant*, 402 F. App'x 543, 545 (2d Cir. 2010) (quoting Fed. R. Evid. 201).  Further, it is well established that courts may take judicial notice of publicly

available documents on a motion to dismiss.  *See Byrd v. City of N.Y.*, No. 04-CV-1396, 2005 WL 1349876, at *1 (2d Cir. June 8, 2005) ("[M]aterial that is a matter of public record may be considered in a motion to dismiss."); *Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (courts can "look to public records, including complaints filed in state court, in deciding a motion to dismiss"); *In re Yukos Oil Co. Secs. Litig.*, No. 04-CV-5243, 2006 WL 3026024, at *21 n.10 (S.D.N.Y. Oct. 25, 2006) ("Court may take judicial notices of [published] articles on a motion to dismiss without transforming it into a motion for summary judgment.") (citing *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991)).  "In the motion to dismiss context, . . . a court should generally take judicial notice 'to determine what statements [the documents] contain[ ] . . . not for the truth of the matters asserted.'"  *Schubert v. City of Rye*, 775 F. Supp. 2d 689, 698 (S.D.N.Y. 2011) (alterations in original) (quoting *Kramer*, 937 F.2d at 774).

## III. <u>Discussion</u>

### A. **Documents the Court May Consider**

Before addressing the merits of Defendants' Motion to Dismiss, I must first address which documents may properly be considered on this Motion.  Both parties attached various documents to their briefs:

- A printout from the NY Database listing Dennison Monarch as an active Delaware corporation as of March 2, 2011, (Rea Decl. Ex. A);

- A printout from New Jersey's online Business Entity Gateway Service ("NJ Database") of a report dated April 25, 2011 listing Dennison Monarch as a dissolved corporation as of August 15, 2001, (Rea Decl. Ex. C);

- The EPA's National Primary Drinking Water Regulations, available at http://epa.gov/ogwdw000/consumer/pdf/mcl.pdf, (Rea Decl. Ex. L);

- An extract of the Board's February 3, 2011 meeting minutes, certified by the Town Clerk, indicating that the Board ratified this lawsuit, (Rea Decl. Ex. N);

- Dennison Monarch's March 6, 2001 Certificate of Dissolution, certified by the Delaware Secretary of State on November 3, 2010 as having been filed in his office on March 15, 2001, (Moench Decl. Ex. D); and

- The VCA, (Moench Ex. I).

The printouts from the NY and NJ Databases, as well as the EPA's National Primary Drinking Water Regulations, are available to the public, so I may take judicial notice of these documents for the fact that the statements contained therein were made, not for their truth.  As the Board's meeting extract and Dennison Monarch's Certificate of Dissolution are documents capable of accurate determination by resort to sources the accuracy of which cannot reasonably be questioned, I may take judicial notice of them as well.  *See Am. Cas. Co. of Reading, PA v. Lee Brands, Inc.*, 05-CV-6701, 2010 WL 743839, at *4 (S.D.N.Y. Mar. 3, 2010) (taking judicial notice of certificate of dissolution filed with California Secretary of State); *City of Newburgh v. Sarna*, 690 F. Supp. 2d 136, 146–47 (S.D.N.Y. 2010) (relying on copy of a city resolution ratifying previously filed lawsuit and supplemental affidavits swearing that lawsuit was approved by City Council *nunc pro tunc*); *cf. Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.*, 170 F.R.D. 361, 373 (S.D.N.Y. 1997) (finding it improper on motion to dismiss to take judicial notice of a date of dissolution on the basis of sworn affidavit only; court must be supplied with a public record establishing dissolution).  Finally, the Amended Complaint refers to, and thus incorporates, the VCA.  Accordingly, I may consider all of these documents on a motion to dismiss.

### B.    Capacity of Dennison Monarch to be Sued

Defendants first argue that Dennison Monarch must be dismissed from the case because, as a corporation dissolved more than three years ago, it lacks capacity to be sued.  (Ds' Mem. 4.) Although I agree with Defendants that a corporation dissolved for at least three years lacks capacity, I decline to dismiss Dennison Monarch at this time.

Rule 17 of the Federal Rules of Civil Procedure provides that a corporation's capacity to be sued is governed "by the law under which it was organized," Fed. R. Civ. P 17(b)(2), which in the case of Dennison Monarch is the law of Delaware.  The law of the state of incorporation also governs the capacity of a dissolved corporation to be sued.  *See Old Republic Ins. Co.*, 170 F.R.D. at 372.  And under Section 278 of Title 8 of the Delaware Code, which governs post-dissolution wind-up, suit can be brought against a corporation only within three years of its dissolution:

> With respect to any action, suit or proceeding begun by or against the corporation either prior to or within 3 years after the date of its expiration or dissolution, the action shall not abate by reason of the dissolution of the corporation; the corporation shall, solely for the purpose of such action, suit or proceeding, be continued as a body corporate beyond the 3-year period and until any judgments, orders or decrees therein shall be fully executed . . . .

Del. Code. Ann. tit. 8, § 278 (2010); *see Marsh v. Rosenbloom*, 499 F.3d 165, 173, 176 (2d Cir. 2007) (affirming dismissal of claims brought against a Delaware corporation post-dissolution because "[w]hen the wind-up period [per section 278] expires, . . . so does the corporation's capacity to be sued.").  Even though the three-year wind-up period is automatically extended to permit resolution for suits brought pre-dissolution, *see In re Citadel Indus., Inc.*, 423 A.2d 500, 504 (Del. Ch. 1980), Section 278 does not allow the initiation of suits more than three years after dissolution, *see In re Dow Chem. Int'l Inc.*, No. 3972, 2008 WL 4603580, at *1 & n.5 (Del. Ch. Oct. 14, 2008) (Section 278 "continues the corporate existence beyond the three-year period solely for the purpose of concluding pending litigation and not to allow new tort claims to be brought against the company") (internal quotation marks omitted).  If Dennison Monarch was in

fact dissolved in 2001, more than three years prior to the beginning of this lawsuit, it would lack

capacity to be sued under Section 278.[6]

Plaintiff argues that, despite Dennison Monarch's 2001 dissolution, the corporation still

has a *de facto* presence in New York and thus has the capacity to be sued.  (P's Mem. 7–8.)[7]  In

support of this argument, Plaintiff points to (1) the fact that Dennison Monarch signed the VCA

in 1999, (2) a public NYSDEC fact sheet dated February 2005—four years after dissolution—

stating that Dennison Monarch will carry out remediation of the Plant property, and (3) Dennison

Monarch's failure to notify the New York Secretary of State that it had dissolved in Delaware.

(*Id.*)[8]  There are thus fact issues as to whether Dennison Monarch in fact dissolved.  Indeed,

Dennison Monarch's failure to notify New York of its dissolution, when it so notified New

---

[6]    Section 278 vests the Delaware Court of Chancery with discretion to "continue" a dissolved corporation
beyond the 3-year wind-up period:

> All corporations, whether they expire by their own limitation or are otherwise
> dissolved, shall nevertheless be continued, for the term of 3 years from such expiration or
> dissolution or for such longer period as the Court of Chancery shall in its discretion
> direct, bodies corporate for the purpose of prosecuting and defending suits, whether civil,
> criminal or administrative, by or against them, and of enabling them gradually to settle
> and close their business, to dispose of and convey their property, to discharge their
> liabilities and to distribute to their stockholders any remaining assets, but not for the
> purpose of continuing the business for which the corporation was organized.

Del. Code Ann. tit. 8, § 278.  Plaintiff argues that this Court has the same authority as the Court of
Chancery, (P's Mem. 9), but Section 278 explicitly vests the Delaware Court of Chancery with this
discretion, not any other court.  *See Marsh*, 499 F.3d at 180 (section 278 "provides for potentially indefinite
extension of the three-year wind-up period in the discretion of the Court of Chancery").  Further, this
discretion to continue a dissolved corporation seems to be only for "prosecuting and defending suits," not
for the purpose of allowing the initiation of a lawsuit.  *See In re Dow Chem.*, 2008 WL 4603580, at *1
("[O]nce the three-year period has expired and there is no pending litigation or assets to be disposed of, the
Court [of Chancery] no longer has discretion to 'continue' the corporate existence under § 278."); *In re
Citadel*, 423 A.2d at 507 (Section 278 "gives this Court no power to 'continue' a corporation . . . on an
application made after the statutory three-year period has expired").  *But see Marsh*, 499 F.3d at 179–80
("[S]ection 278 provides for extension of the wind-up period beyond three years as the Court of Chancery
shall in its discretion direct, which could give a potential CERCLA plaintiff time to investigate the
contamination site while preserving its ability to make a claim against the dissolving corporation.")
(internal quotation marks omitted).

[7]    "P's Mem." refers to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the
Amended Complaint.  (Doc. 26.)

[8]    Dennison Monarch did advise New Jersey of its dissolution in 2001.  (Rea Decl. Ex. C.)

Jersey, and when Dennison Monarch was the signatory to the VCA with NYSDEC, could suggest an effort to avoid liability by acting through a nominally dissolved corporation.

To resolve these factual issues, as well as to allow Plaintiff an opportunity to find a suitable stand-in for Dennison Monarch,[9] I defer the issue of capacity until summary judgment, and deny Defendants' Motion to Dismiss at this stage.

## C.    Service of Process on Dennison Monarch

As an alternative to dismissing Dennison Monarch for lack of capacity, Defendants argue that the Complaint and Amended Complaint were not properly served on Dennison Monarch, and thus it must be dismissed under Rules 12(b)(5) and 12(b)(2) of the Federal Rules of Civil Procedure for insufficient process and lack of jurisdiction.  (Ds' Mem. 7–10.)  Specifically, Defendants argue that (1) the Complaint was served on Dennison Monarch's former registered agent in Delaware, not the New York Secretary of State as required by N.Y. Bus. Corp. Law §§ 306(b)(1), 1311 (McKinney 2003), *see* Fed. R. Civ. P. 4(e)(1), (h)(1)(a) (service of process may be made on a corporation by following the law of the state in which the district court is located); and (2) the Amended Complaint was never served on Dennison Monarch.  Plaintiff responds that it served the Complaint on Dennison Monarch's registered agent in Delaware because,

---

[9]    Plaintiff notes that it would welcome a stipulation that Defendants Avery Dennison and Dennison Manufacturing are corporate successors to Dennison Monarch, and thus the real parties in interest in this suit.  (P's Mem. 7 n.2.)  Plaintiff should explore this possibility with Defendants.  If the parties cannot agree to a stipulation, they may, on summary judgment having had the benefit of discovery, brief the issue of whether Avery Dennison and Dennison Manufacturing are the real parties in interest.  Also, Plaintiff might be able to make an application to the Delaware Court of Chancery, under Title 8, Section 279 of the Delaware Code, which allows a creditor "who shows good cause" to make an application to that court to appoint a trustee or receiver for a dissolved corporation to defend against lawsuits in the name of the corporation.  *See In re Citadel*, 423 A.2d at 507 (vacating an *ex parte* order of the Court of Chancery to join a defendant to a pending litigation in Texas under Section 278 after three-year wind-up period had expired; "[a]t that point, the Court was only empowered, in its discretion, to appoint a receiver or trustee under [Section] 279 to act on behalf of the corporation as though it were still 'in being.'").  During discovery, Plaintiff should investigate whether Dennison Monarch has any assets left; if not, a Section 279 application would be futile.  *See In re Dow Chem.*, 2008 WL 4603580, at *2 ("[P]etitioner cannot use § 279 to bypass the three-year limitation under § 278 when a dissolved corporation holds no assets.").

reasonably, it saw in the NY Database that Dennison Monarch was an active Delaware corporation registered to do business in New York, and did not learn of its dissolved status until speaking with its attorney after the attempted service.  (Rea Decl. ¶¶ 2–3.)  Plaintiff also notes that it did serve the Amended Complaint on the New York Secretary of State, per N.Y. Bus. Corp. Law § 306.  (Rea Decl. ¶ 4.)

The record indicates that a copy of the summons and Complaint were served on Dennison Monarch's Delaware agent, not the New York Secretary of State, (Doc. 12.), which would be sufficient if Dennison Monarch was not dissolved at the time.  *See* Fed. R. Civ. P. 4(h)(1)(B) (service on corporation may be made by delivering copy of summons and complaint to authorized agent and mailing a copy of each to defendant if required by statute authorizing agent).  Also, it appears that copies of only the Amended Complaint, not the summons, were served on the New York Secretary of State.  (Doc. 20.)  Thus it appears that Dennison Monarch has not been properly served, but again, given the factual issues surrounding its dissolution, I defer dismissing it at this time for insufficient service, and order Plaintiff (if no agreement regarding service can be reached with Dennison Monarch's counsel) to effectuate proper service on the New York Secretary of State per New York law.[10]

### D.    Doctrine of Primary Jurisdiction

Defendants next argue that the doctrine of primary jurisdiction requires this Court to dismiss all of Plaintiff's claims because NYSDEC has the expertise to oversee the remediation and examine the environmental issues raised by the Town.  (Ds' Mem. 11–15.)  I disagree.

---

[10]    Resolution of these factual issues may also determine whether I must give Plaintiff more time to effectuate service "for good cause," or whether I may give them more time in my discretion.  *See* Fed. R. Civ. P. 4(m); *see also Zapata v. City of N.Y.*, 502 F.3d 192, 196–97 (2d Cir. 2007) (Court must give plaintiff who shows good cause more time to effectuate service, but may, in its discretion, extend the time to complete service even if plaintiff does not show good cause).

The doctrine of primary jurisdiction "comes into play whenever enforcement of [a] claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Johnson v. Nyack Hosp.*, 964 F.2d 116, 122–23 (2d Cir. 1992) (internal quotation marks omitted) (finding primary jurisdiction doctrine applicable to cases involving state agencies); *see also Martin v. Shell Oil Co.*, 198 F.R.D. 580, 585 (D. Conn. 2000) (same, where Plaintiff, in a diversity case, brought claims including negligence, strict liability for ultrahazardous activities, private nuisance, and trespass). Primary jurisdiction is a discretionary doctrine that will be applied only where it serves at least one of two purposes: "uniformity" or "reliance on administrative expertise." *Tassy v. Brunswick Hosp. Ctr., Inc.*, 296 F.3d 65, 68 (2d Cir. 2002); *see also Johnson*, 964 F.2d at 122 ("Primary jurisdiction . . . recognizes that even though Congress has not empowered an agency to pass on the legal issues presented by a case raising issues of federal law, the agency's expertise may, nevertheless, prove helpful to the Court in resolving difficult factual issues.") (emphasis omitted). The doctrine aims to "ensure that courts and agencies with concurrent jurisdiction over a matter do not work at cross-purposes." *Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp.*, 84 F.3d 91, 97 (2d Cir. 1996). "Referral of the issue to the administrative agency does not deprive the court of jurisdiction; it has discretion either to retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice." *Reiter v. Cooper*, 507 U.S. 258, 268–69 (1993); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 175 F. Supp. 2d 593, 616 (S.D.N.Y. 2001) ("The doctrine of primary jurisdiction allows a federal court, in the exercise of its discretion, to stay an action and refer a matter extending beyond the conventional experiences of judges or falling within the realm of

administrative discretion to an administrative agency with more specialized experience, expertise, and insight.") (internal quotation marks omitted).

Courts generally balance four factors in determining whether to dismiss or stay a case based on primary jurisdiction: "(1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made." *See Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. & Tel. Co.*, 46 F.3d 220, 222 (2d Cir. 1995) (internal quotation marks omitted).  Courts must also weigh "the advantages of applying the doctrine against the potential costs resulting from complications and delay in the administrative proceedings."  *Id.* at 223.

In this case, as to the first factor, there are no policy considerations that are firmly within NYSDEC's field of expertise.  Plaintiff's lawsuit is based on common law causes of action commonly adjudicated by courts, and will not require extensive interpretation of agency regulations.  While NYSDEC of course has greater technical expertise than the Court in environmental matters, I do not believe that such expertise will be required to determine liability in this case, *accord Martin*, 198 F.R.D. at 585–86,[11] and I decline to defer to NYSDEC simply because this case touches upon technical environmental issues, *see Luckey v. Baxter Healthcare Corp.*, No. 95-CV-509, 1996 WL 242977, at *5 (N.D. Ill. May 9, 1996) (primary jurisdiction not applicable, despite EPA expertise, because "[t]housands of tort cases involving technical issues

---

[11]   At this stage of the litigation, I need only decide whether Plaintiff's claims are plausibly alleged.  Should discovery unearth any technical issues beyond the ken of this Court or best suited for resolution by NYSDEC, the Court can revisit whether input from NYSDEC would be helpful, and whether to stay or dismiss this litigation, at that time.  *See DMJ Assocs., L.L.C. v. Capasso*, 228 F. Supp. 2d 223, 226, 230 (E.D.N.Y. 2002) (declining stay based on primary jurisdiction after partial discovery and consideration of NYSDEC testimony regarding nature of proposed involvement at contamination site, length of a proposed remedial investigation and feasibility study, and views on potential conflict with ongoing litigation).

of product design and safety are decided by courts every year, and the plaintiff's case [is]

indistinguishable. . . . [I]f the district court believe[s] that it need[s] information from the EPA, it

[can] ask the agency to file an amicus brief.").

As to the second factor, NYSDEC does not have the power under the VCA to award

Plaintiff damages or issue injunctive relief.  Defendants correctly point out that should NYSDEC

determine "that remediation is necessary off-Site to eliminate significant threats arising from the

Site, it shall so state in writing; and both parties shall develop a proposed Remediation Work

Plan that shall be noticed for public comment."  (VCA ¶ I.3, at 6.)  The VCA goes on, however,

to allow Defendants to "elect[] not to develop a Remediation Work Plan," which will result in

termination of the VCA.  (*Id.*)  NYSDEC may still sue for breach of the VCA, but only to

enforce certain obligations of the VCA, which do not include remediating Plaintiff's property.

(VCA ¶ I.3.iii, at 6, ¶ IV.A, at 13.)  *Cf. Collins v. Olin Corp.*, 418 F. Supp. 2d 34, 46 (D. Conn.

2006) (dismissing claims for injunctive relief, not damages, where court was satisfied that

consent order between defendant and state environmental agency that provided for investigation

and remediation would sufficiently address plaintiff's concerns).  Further, the VCA was signed

in 1999.  As Plaintiff alleges, in over eleven years since then, Defendants have not remediated

Plaintiff's land in the face of data that contamination has reached the Wells.  Thus, as a practical

matter, that the VCA and NYSDEC oversight have not been effective in remedying the

contamination of Plaintiff's land also justifies this Court's retention of jurisdiction.

As to the third and fourth factors, there is no substantial danger of inconsistent rulings,

nor is this Court aware of any previous proceedings involving Plaintiff and Defendants before

NYSDEC.  As discussed above, while it is conceivable that NYSDEC factual findings may help

to inform this Court, I do not believe at this point that any are necessary for me to make legal

rulings, nor will any such ruling necessarily conflict with any factual finding.  *Accord Martin*,

198 F.R.D. at 586 (for example, a "trespass is a trespass, and no ruling as to whether defendants

trespassed on plaintiff['s] property will necessarily conflict with any finding of the state

agency.")  Further, Plaintiff seeks damages here, and "courts generally do not defer jurisdiction

where plaintiffs seek damages for injuries to their property or person."  *In re MBTE Prods. Liab.

Litig.*, 175 F. Supp. 2d at 618 (compensatory and punitive damages sought, as well as injunctive

relief).

      Finally, the balance of the advantages of deferring to NYSDEC against the potential costs

resulting from complications and delay in the administrative proceedings favors proceeding with

the case in this Court.  As I have said, there are no apparent advantages to dismissing or staying

the case at this time, and the Amended Complaint plausibly alleges that there has already been

excessive delay.  Plaintiff brought this lawsuit more than eleven years after the VCA was signed

because Defendants have not satisfactorily remediated the Plant property.  This lengthy process

has now allegedly caused a water supply crisis for Plaintiff.  Further, the VCA does not require

remediation of damage allegedly caused to Plaintiff's property by Defendants' manufacturing

operations.  Deferring to administrative proceedings that do not even directly address the damage

to Plaintiff's property would thus cause additional needless delay.

      As all the above factors point to the lawsuit proceeding in this Court, Defendants' Motion

to Dismiss based on primary jurisdiction is denied.  *Accord id.* at 598–99, 616–18 (denying

motion to dismiss on primary jurisdiction grounds in multi-district litigation comprising several

putative class actions brought on behalf of well owners seeking relief, including court-supervised

testing, monitoring, and remediation, from petroleum companies for contamination or threatened

contamination of wells with gasoline additive).

### E.       Plaintiff's Capacity to Sue

Defendant next argues that Plaintiff lacks capacity to sue because the Board did not

authorize the suit by the time the original Complaint was filed on October 8, 2010.  (Ds' Mem.

16–17.)  I disagree.  As with corporations, state law determines whether towns have capacity to

sue or be sued.  *See Yonkers Comm'n on Human Rights v. City of Yonkers*, 654 F. Supp. 544, 551

(S.D.N.Y. 1987) (capacity of Yonkers-created commission determined by New York law); Fed.

R. Civ. P. 17(b) (capacity for parties other than individuals or corporations determined "by the

law of the state where the court is located").  New York Town Law § 65 provides:  "The town

board of any town may authorize and direct any town officer or officers to institute . . . any

action or legal proceeding, in the name of the town, as in its judgment may be necessary, for the

benefit or protection of the town, in any of its rights or property."  N.Y. Town Law § 65(1)

(McKinney 2004).  The Town board ratified the filing of the Complaint in a resolution dated

February 2, 2011, and Defendants do not dispute this fact.  (Ds' Mem. 17; *see* Rea Decl. ¶ 19,

Ex. N.)  Ratification of the lawsuit after the filing of the Complaint is sufficient to give Plaintiff

capacity to sue.  *See Town of Caroga v. Herms*, 878 N.Y.S.2d 834, 836 (3d Dep't 2009) ("While

previously we have held that town board authorization requires a resolution, we have not

interpreted the rule rigidly and have allowed a resolution to effectuate town authorization *nunc

pro tunc*.") (citations omitted); *cf. Sarna*, 690 F. Supp. 2d at 146–47 ("Even if there remains

some uncertainty as to whether it was properly authorized in the first place, it would be a waste

of time and resources to dismiss this case on the ground that Plaintiff lacks capacity to sue, only

to have the Council vote to refile it immediately.").[12]  Defendants' Motion to Dismiss based on

Plaintiff's lack of capacity is therefore denied.

---

[12]       Plaintiff in any event asserts that the Board authorized the lawsuit in executive session before the case was
brought, (P's Mem. 13; Rea Decl. Ex. N (indicating that on February 1, 2010, the Board authorized the

Defendants further assert that "Plaintiff's curing of the capacity defect should not allow Plaintiff to gain a litigation advantage," and request that this Court "reset" the filing date of the Complaint to February 8, 2011, "the date on which Plaintiff's Counsel was permitted to file suit."  (Ds' Mem. 17.)  Defendants do not cite any case law authorizing such a request, nor do they provide a logical explanation for it.  It is not clear what "litigation advantage" Plaintiff has gained as a result of curing its capacity defect.  On summary judgment, I will consider any argument Defendants may have as to the relevance of Plaintiff's ratification of the lawsuit, but on this Motion to Dismiss, Plaintiffs are not entitled to have this Court declare the lawsuit to have been filed on a day when it was not.

I now turn to Defendants' substantive arguments for dismissal of Plaintiff's claims for ultrahazardous activities, trespass, and private nuisance.

### F.       Strict Liability for Ultrahazardous or Abnormally Dangerous Activities

"One who carries on an ultrahazardous or abnormally dangerous activity is strictly liable for the harm inflicted by the activity."  *Abbatiello v. Monsanto Co.*, 522 F. Supp. 2d 524, 531 (S.D.N.Y. 2007) (citing *Doundoulakis v. Town of Hempstead*, 42 N.Y.2d 440 (1977)); *see also State v. Schenectady Chems., Inc.*, 459 N.Y.S.2d 971, 976 (Sup. Ct. 1983) ("One who creates a nuisance through an inherently dangerous activity or use of an unreasonably dangerous product is absolutely liable for resulting damages, irregardless [*sic*] of fault, and despite adhering to the highest standard of care.").  Imposing strict liability for harm caused by ultrahazardous activities is a policy choice:  "those who engage in activity of sufficiently high risk of harm to others,

---

filing of lawsuit if no settlement could be reached), thus suggesting that the February 3, 2011 ratification was merely a formality.  *See Town of Caroga*, 878 N.Y.S.2d at 836 ("In sum, because the record amply supports Supreme Court's determination that the Board did discuss and intend to officially authorize the lawsuit prior to its commencement—albeit not by a vote during open session—and thereafter ratified the action by a formal resolution, we find that plaintiff had capacity to commence the action.")

especially where there are reasonable even if more costly alternatives, should bear the cost of harm caused the innocent." *Doundoulakis*, 42 N.Y.2d at 448 (citing Restatement (Second) of Torts ("Restatement") § 519 (1977)).

"It is for the court to decide whether an activity of a landowner is abnormally dangerous and warrants imposition of strict liability." *Mayore Estates, LLC v. Port Auth. of N.Y. & N.J.*, No. 02-CV-7198, 2003 WL 22232918, at *2 (S.D.N.Y. Sept. 26, 2003) (citing Restatement § 520, cmt.1). The New York Court of Appeals follows the six-factor test listed in Restatement § 520 in making that determination:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes.

*see Doundoulakis*, 398 N.Y.S.2d at 448 (internal quotation marks omitted); *see also Searle v. Suburban Propane Div. of Quantum Chem. Corp.*, 700 N.Y.S.2d 588, 591 (3rd Dep't 2000). The Restatement explains how to apply these factors:

> [A]ll [are] to be considered, and are all of importance. Any one of them is not necessarily sufficient of itself in a particular case, and ordinarily several of them will be required for strict liability. On the other hand, it is not necessary that each of them be present, especially if others weigh heavily.

Restatement § 520 cmt.f; *see Kowalski v. Goodyear Tire & Rubber Co.*, 841 F. Supp. 104, 109 (W.D.N.Y. 1994); *Doundoulakis*, 398 N.Y.S.2d at 448 ("Analysis of no one factor is determinative").[13] I turn to these factors now, taking the factual allegations in Plaintiff's Amended Complaint as true.

---

[13]     Defendants argue that "Plaintiff has simply not pled any facts or even a formulaic recitation of the elements of a cause of action" to support its theory of strict liability for ultrahazardous/abnormally dangerous activity, and goes on to list the Restatement factors as the elements for a ultrahazardous activity claim. (Ds' Mem. 19.) On a review of the case law, these Restatement factors are not treated as elements of strict liability claims based on ultrahazardous activities. Indeed, not all of the factors need to be satisfied for the

I find that the first two factors plausibly support imposition of strict liability.  Plaintiff has alleged that Defendants have, for decades, been using large amounts of hazardous solvents, some of which can cause liver, nervous system, and circulatory problems, as well as an increased risk of cancer.  Moreover, Plaintiff has alleged, and provided facts (including governmental actions and Defendants' own investigations) suggesting that Defendants knew that the chemicals they were using and discharging into the soil, groundwater, and bedrock under the Plant were hazardous, and that the groundwater below the Plant property moved towards Plaintiff's property and the Wells, which were adjacent to the Plant property.  Based on these factual allegations, I find it plausible that there is a high degree of risk not only of some contamination to Plaintiff's land, but also of adverse health effects to the people of New Windsor should they drink water from the Wells, and that the resulting harm is likely great.  And given the alleged length of delay on Defendants' part in beginning remediation, the length of Defendants' use of the hazardous substances, and the potential health consequences for the people of New Windsor, these first two factors weigh especially heavily.

The fourth factor—the extent to which the activity is not a matter of common usage— mildly favors the imposition of strict liability.  Plaintiff contends that a manufacturing plant that uses thousands of gallons of hazardous solvents is not of common usage, at least when compared with, for example, the storage of gasoline and propane, the substances at issue in most of the cases upon which Defendants rely.  (P's Mem. 18.)  This argument is unsupported by any factual allegations in the Amended Complaint, *cf. Abbatiello*, 522 F. Supp. 2d at 533 (complaint alleged defendant was sole United States manufacturer of the chemicals at issue, and thus the

---

activity to be deemed ultrahazardous.  Thus, because Plaintiff has alleged that Defendants' activities were ultrahazardous/abnormally dangerous, I need only examine the facts as alleged to determine whether Plaintiff's claim is plausible, using the Restatement factors as a guide.

manufacture, sale, and delivery of those chemicals was not a matter of common usage), but drawing on my "judicial experience and common sense" in determining whether Plaintiff states a plausible claim for relief, *Iqbal*, 129 S. Ct. at 1950, I conclude that a manufacturing plant that uses massive amounts of hazardous solvents is not common, or at least much less common than gasoline stations and household storage of gasoline or propane.

The last two Restatement factors are supported by factual allegations in the Amended Complaint, and also favor Plaintiff.  First, Defendants' operations were plausibly not appropriate for their location, adjacent to Plaintiff's property and the Wells and close enough to the border of Defendants' property so that a solvent plume could extend past it.  Second, the potential to cause serious health problems should Town residents drink contaminated water plausibly outweighs the value to the community of Defendants' operations, which involved the manufacture of metal office furniture and accessories, office equipment, and computer equipment.

The third factor is the only one that does not support Plaintiff's strict liability claim.  The Amended Complaint does not allege facts regarding the ability or inability to eliminate the risks associated with Defendants' use of the hazardous chemicals by exercising reasonable care.  For instance, there is no allegation regarding the feasibility of preventing the chemicals from being discharged into the soil beneath the Plant.  Unlike the issue of common usage, I cannot use my judicial experience or common sense to make a finding regarding the ability or inability to eliminate the risks associated with Defendants' operations.

Balancing all of the Restatement factors, and weighing the risk of harm and risk that that harm will be great especially heavily, I find it plausible that Defendants' use of the solvents was an ultrahazardous or abnormally dangerous activity.  *Accord New York v. Shore Realty Corp.*, 759 F.2d 1032, 1051–52 (2d Cir. 1985) ("[W]hile we recognize that determining whether an

activity is abnormally dangerous depends on the circumstances, a review of the undisputed facts under the guidelines stated in [*Doundoulakis*, 42 N.Y.2d at 448], convinces us that a New York court would find as a matter of law that [defendant's] maintenance of the site—for example, allowing corroding tanks to hold hundreds of thousands of gallons of hazardous waste—constitutes abnormally dangerous activity . . . ."); *Abbatiello*, 522 F. Supp. 2d at 533 (denying motion to dismiss strict liability claim for ultrahazardous activities where defendants dispersed chemicals with serious adverse health effects onto plaintiff's land); *United States v. Hooker Chems. & Plastics Corp.*, 722 F. Supp. 960, 966–67 (W.D.N.Y. 1989) ("While the New York courts have not explicitly held that the disposal of hazardous wastes by the generator is, in itself, an abnormally dangerous activity requiring the application of strict liability standards, the language employed by the leading cases certainly indicate that such a holding would not be unreasonable in a case such as the instant one, in which it is undisputed that such wastes have been released into the environment so as to endanger or injure the property, health, safety or comfort of a considerable number of persons.") (internal quotation marks omitted); *DaCosta v. Trade-Winds Envtl. Restoration, Inc.*, 877 N.Y.S.2d 373, 375 (2d Dep't 2009) (on motion to dismiss, plaintiff sufficiently alleged cause of action for strict liability where "plaintiff alleged that the decontamination process was abnormally dangerous in that it involved the use of chemicals and other toxic substances that were extremely hazardous and harmful to personal property").

Defendants contend that courts in New York have held that the storage and handling of gasoline, chemicals, hazardous material, or petroleum does not constitute ultrahazardous activity. (Ds' Mem. 18.)  In support, Defendants cite a host of New York state cases, but I do not find them persuasive.  Most of the cases Defendants cite involve the storage of gasoline or similar

products.  *See 750 Old Country Road Realty Corp. v. Exxon Corp.*, 645 N.Y.S.2d 186, 187 (4th

Dep't 1996) (storage of gasoline not ultrahazardous activity); *Searle*, 700 N.Y.S.2d at 591

(propane use widespread and reasonable precautions can be taken to prevent explosion, thus

storage not ultrahazardous); *Snyder v. Jessie*, 565 N.Y.S.2d 924, 929 (4th Dept. 1990)

(residential storage and delivery of heating oil not an ultrahazardous activity); *Plainview Water*

*Dist. v. Exxon Mobil Corp.*, No. 009975-01, 2006 N.Y. Misc. LEXIS 3730, at *33 (Sup. Ct.

2006) ("[T]he evidence presented falls short of establishing that the storage of gasoline

containing MTBE constitutes an ultrahazardous activity.").  Those cases are inapposite because

they involve common products and do not highlight, or even discuss, the serious risk of adverse

health effects that the solvents in this case present.[14]  Moreover, they focus on only one or two of

the Restatement factors, *see also, e.g.*, *Plainview Water Dist.*, 2006 N.Y. Misc. LEXIS 3730, at

*33 ("[W]here the evidence supports a finding that the dangers associated with the activity in

question can be eliminated or diminished with the exercise of reasonable care, dismissal is

appropriate, since an activity which can be safely performed generally will not be deemed to be

ultrahazardous."); *Nat'l R.R. Passenger Corp. v. N.Y.C. Hous. Auth.*, 819 F. Supp. 1271, 1279

(S.D.N.Y. 1993) (plaintiff acknowledged that had defendant exercised reasonable care in

maintaining asbestos containing material, no nuisance would have occurred; thus claim based on

ultrahazardous activity dismissed), which may have been reasonable in those cases, but is not in

this one.  As discussed above, the balance of the Restatement factors, no one of which is

---

[14]     Defendants also cite *DeFoe Corp. v. Semi-Alloys, Inc.*, 549 N.Y.S.2d 133 (2d Dep't 1989), but that case is
inapposite as well.  There, "[w]hile the record establishe[d] that sodium hydroxide was an active caustic
chemical, there was no showing that its use . . . posed a great danger of invasion to the land of others," no
showing that the defendant could not eliminate the risk by the exercise of reasonable care, and no showing
that the activity was inappropriate in the place it was carried on.  *Id.* at 135.  In this case, Plaintiff has
alleged that Defendants used the solvents on the Plant property adjacent to Plaintiff's and that Defendants
knew that there was a danger of invasion of Plaintiff's land.  These facts, in addition to those discussed
above, distinguish this case from *DeFoe*.

dispositive, support the conclusion that Defendants' use of the solvents could plausibly constitute

an ultrahazardous activity.  Accordingly, Defendants' motion to dismiss Plaintiff's cause of

action for strict liability due to Defendants' ultrahazardous activities is denied.

### G.    Trespass

Plaintiff also alleges a trespass claim for Defendants' decades-long use of chlorinated

solvents and related contamination of Plaintiff's land.  (Am. Compl. 14–16.)  Defendants argue

that Plaintiff's trespass claim must be dismissed because Plaintiff fails to allege the requisite

intent.  (Ds' Mem. 20–22.)  I find that Plaintiff has plausibly alleged such intent.

"Under New York law, trespass is the intentional invasion of another's property."

*Scribner v. Summers*, 84 F.3d 554, 557 (2d Cir. 1996); *see Abbatiello*, 522 F. Supp. 2d at 541.

"To be liable, the trespasser 'need not intend or expect the damaging consequences of his

intrusion[;]' rather, he need only 'intend the act which amounts to or produces the unlawful

invasion.'" *Scribner*, 84 F.3d at 557 (alteration in original) (quoting *Phillips v. Sun Oil Co.*, 307

N.Y. 328, 331 (1954)).  "The intrusion itself 'must at least be the immediate or inevitable

consequence of what [the trespasser] willfully does, or which he does so negligently as to

amount to willfulness.'" *Id.* (alteration in original) (quoting *Phillips*, 307 N.Y. at 331).

Specifically, pollution of neighboring property will give rise to liability for trespass if the

defendant (1) "intend[ed] the act which amounts to or produces the unlawful invasion," and (2)

"had good reason to know or expect that subterranean and other conditions were such that there

would be passage [of the pollutants] from defendant's to plaintiff's land." *Id.* at 558 (internal

quotations marks and emphasis omitted).

For example, in *Scribner v. Summers*, the Second Circuit concluded that the defendants

were liable for trespass where they washed and demolished furnaces in close proximity to the

plaintiff's property for four years.  *Id.*  These furnaces were tainted with barium, a known

hazardous waste.  *Id.*  The water carried the barium to swales located on the defendants' land, but

near plaintiff's.  *Id.*  The court found that the defendants possessed the required intent for

trespass because they intended the acts that caused the trespass—the demolition and washing of

the furnaces—and had good reason to know or expect that the barium would travel from the

swales to the plaintiff's property, which was at a lower elevation.  *Id.*; *cf. Phillips*, 307 N.Y. at

330 (no trespass where "no showing . . . as to how the fluid found its subterranean way from

defendant's to plaintiff's premises, and there is nothing to show that defendant knew, or had

been put on notice, that gasoline was escaping from its underground tank."); *Snyder*, 565

N.Y.S.2d at 925, 929 (no requisite intent for trespass where defendant inadvertently overfilled a

customer's underground fuel oil tank, causing it to overflow and oil to migrate underground to

plaintiff's land).

    Defendants do not dispute that they intended the acts that caused the contamination of

Plaintiff's land; they argue only that Plaintiff has not alleged that Defendants had good reason to

know or expect that subterranean or other conditions were such that there would be passage from

Defendants' to Plaintiff's property.  (Ds' Mem. 22.)  I disagree.  The Amended Complaint states

that Defendants knew the chlorinated solvents were toxic; that Defendants discharged massive

amounts of solvents over many years into the soil, groundwater, and bedrock underlying the

Plant property; and that Plaintiff's property was adjacent to Plant property.  These facts alone

could be enough to support a plausible claim for trespass on the theory that, given the level of

pollution on the Plant property and its proximity to Plaintiff's land, Defendants should have

known that the contamination could spread to Plaintiff's land.  *Accord Abbatiello*, 522 F. Supp.

2d at 542 ("[Plaintiffs] allege that [defendant] knew, or should have known, that the [chemicals]

would migrate onto their properties.  This allegation is sufficient to survive a motion to dismiss.").[15]  But Plaintiff goes even further, alleging that Defendants' own environmental consultants reported that groundwater beneath the Plant property moves in an easterly direction from the solvent pits toward Plaintiff's property.[16]  This allegation renders even more plausible Plaintiff's claim that Defendants had reason to know that the solvents would migrate into Plaintiff's land.  Accordingly, Defendants' motion to dismiss Plaintiff's claim for trespass is denied.

### H.    Private Nuisance

Defendants challenge Plaintiff's private nuisance claim on two grounds:  (1) Plaintiff has not sufficiently alleged facts to support the elements of a private nuisance claim, (Ds' Mem. 23–25), and (2) the conduct alleged in the Amended Complaint and resulting large scale impact of contamination of Plaintiff's water supply are not consistent with or sustainable under a private nuisance theory, (Ds' Repl. 9).[17]  I agree with Defendants' second argument, and thus need not address the first.

Under New York law, "'a private nuisance threatens one person or a relatively few, an essential feature being an interference with the use or enjoyment of land.  It is actionable by the

---

[15]    *Abbatiello* was decided before *Iqbal*, but after *Twombly*.  In any event, as here the plaintiff in *Abbatiello* alleged facts to support a plausible claim for trespass.  For instance, the defendants dumped waste containing hazardous chemicals into three landfills, two wetlands, and two streams that were on the defendants' property near the plaintiffs'.  *Abbatiello*, 522 F. Supp. 2d at 528–29.

[16]    The Amended Complaint is somewhat unclear as to when Defendants allegedly learned from their environmental consultants of the easterly flow of groundwater under the Plant.  (*See* Am. Compl. ¶ 3.)  It appears that Defendants' environmental investigations began "nearly 20 years ago . . . during the 1990s." (*Id.* ¶ 22.)  Even if Defendants' manufacturing operations, which ended in 1994, (*id.* ¶ 2), occurred without this knowledge, as discussed above, Plaintiff still makes out a plausible claim for trespass (and ultrahazardous activity) given that Defendants should have known that dumping chemicals close to Plaintiff's property could result in its contamination.

[17]    "Ds' Repl." refers to Defendants' Reply Memorandum in Further Support of Defendants' Motion to Dismiss the Amended Complaint.  (Doc. 25.)

individual person or persons whose rights have been disturbed.'"  *Scribner*, 84 F.3d at 559

(quoting *Copart Indus., Inc. v. Consol. Edison Co. of N.Y.*, 41 N.Y.2d 564, 568 (1977)).  On the

other hand, "a public nuisance consists of conduct . . . which [offends or interferes with] the

public in the exercise of rights common to all, in a manner such as to . . . interfere with use by

the public of a public place or endanger or injure the property, health, safety or comfort of a

considerable number of persons."  *New York ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d

184, 201 (2d Cir. 2001) (alterations in original and internal quotation marks omitted).  A public

nuisance "'is an offense against the [appropriate governmental entity] and is subject to abatement

or prosecution on application of the proper governmental agency.'"  *Shore Realty*, 759 F.2d at

1050 (quoting *Copart Indus.,* 41 N.Y.2d at 568).

  Here, as Defendants point out, Plaintiff, the Town, has brought this suit to remedy alleged

contamination of its drinking water supply.  This contamination has the potential to injure a

public resource and endanger the health of Plaintiff's residents, a considerable number of people

rather than one person or relatively few people.  Thus, Plaintiff's claim is not one for private

nuisance, but rather may plausibly be one for public nuisance.  Accordingly, Defendants' Motion

to Dismiss Plaintiff's private nuisance claim is granted.[18]

---

[18]  Defendants do not challenge Plaintiff's public nuisance claim.

**IV.**    <u>**Conclusion**</u>

For the reasons above, Defendants' Motion to Dismiss Plaintiff's strict liability and trespass claims is DENIED.  Defendants' Motion to Dismiss Plaintiff's private nuisance claim is GRANTED.  The Clerk of Court is respectfully directed to terminate the pending motion.  (Doc. 22).  The parties are directed to appear for a conference on March 23, 2012 at 10:15 a.m.

**SO ORDERED.**

Dated: March ___, 2012
       White Plains, New York

                                    CATHY SEIBEL, U.S.D.J.